EL PUEBLO DE PUEBLO DE PUERTO RICO, demandante y
apelado, *v.* BENIGNO RIVERA ROMERO, C/P BENIGNO
RIVERA POWER, acusado y apelante.

*Número:* 16,673. *Resuelto:* 15 de septiembre de 1961.

*Félix Rodríguez Higgins,* abogado del acusado-apelante; *Arturo Estrella, Procurador General Interino de Puerto Rico* y *Genoveva R. de Carreras, Procurador General Auxiliar,* abogados de El Pueblo, apelado.

Sala integrada por el Juez Asociado Señor Hernández Matos, como Presidente de Sala, y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

En uno de los días del mes de junio de 1957, el acusado y su hermano José llegaron como a las 11 de la noche a un bar sito en la carretera que de Guaynabo conduce a La Muda. Pidieron de beber y fueron servidos. Preguntaron si había de comer y pasaron a la cocina. Le pidieron a la cocinera que les sirviera. En ese momento llegaron otros parroquianos. Cuando el administrador del negocio fue a servirle a los que acaban de llegar, notó que José perseguía y molestaba a la cocinera y le pidió que se saliera afuera. Al tratar de poner orden en el negocio comenzó un forcejeo entre los dos y José cayó al suelo. En eso, el acusado salió de la cocina y se le tiró encima al administrador con un puñal. Este se tiró al suelo, pero siempre lo hirió. Estando en el piso trató de tirarle otra vez. Intervinieron los que allí estaban y pudo levantarse y huir hacia una loma situada cerca del local. Desde allí observó lo que pasó después. Los parroquianos que llegaron después que el acusado, trataron de irse, pero José los hizo virar para al rato permitirles que se fueran. Poco tiempo después llegaron dos policías de apellidos Crespo y Salicrup. Cuando investigan lo que había ocurrido, el acusado y su hermano atacan a los policías y los desarman. Reciben heridas de puñal y de balas. Luego del acusado matar al policía Crespo se dirige a Salicrup que ya había sido agredido por José, y le hizo unos disparos con el revólver que le había quitado a Crespo, para terminar dándole con el arma. Los cuerpos de los policías quedaron en la carretera al frente del bar. Un automóvil que pasa y trata de parar recibe un disparo, prosiguiendo entonces la marcha. El acusado y su hermano se van del lugar. El acusado es arrestado en su casa. Al otro día, en fiscalía le informa al fiscal que

el revólver de Crespo está en su casa. Un detective va a la casa y allí lo encuentra. Contra el acusado y su hermano(¹) se radicaron dos acusaciones por asesinato en primer grado. Una por la muerte de Crespo y otra por la de Salicrup. Contra el apelante se radicó acusación por ataque para cometer asesinato en la persona del administrador del negocio. Se le acusó además de portar armas, un revólver y un puñal, y de no tener el arma registrada. El apelante fue declarado culpable en los dos casos de asesinato. En el de ataque para cometer asesinato fue declarado culpable de acometimiento y agresión grave. En el de registro de armas el tribunal lo absolvió pero lo declaró culpable en los dos casos de portación de armas. Apeló de las cinco sentencias condenatorias y para sostener sus recursos apunta sendos errores que consideramos a continuación.

1. Arguye el apelante que se le negó el derecho a un juicio público e imparcial porque las personas que asistieron a la vista del caso tuvieron que someterse a registro previo. Cabe señalar que sólo consta en autos, la admisión que hizo el juez sentenciador de que dictó una orden a ese efecto. Sin embargo no aparece constancia de que el acusado hubiere hecho objeción a dicha orden durante el juicio o que ésta fuese dictada en presencia del jurado ni la situación que la motivó.

■ No tiene mérito la contención del apelante ya que no fue ésta una orden con carácter de exclusión total y sí una medida de seguridad impuesta por el juez con el propósito de mantener el debido decoro y orden en los procedimientos. No es lógico asumir, sin haber prueba al efecto, que dicha medida de seguridad de hecho constituyó una orden de exclusión general que privó al acusado de su derecho a un juicio público. Debemos presumir que toda persona que se sometió al registro ordenado le fue permitido acceso sin discrimen de clase alguno al juicio en que se condenó al aquí apelante. Esta situación

---

(¹) El coacusado José Rivera Romero fue declarado mentalmente incapacitado y recluido en el Hospital de Psiquiatría.

ya ha sido considerada en otras jurisdicciones, donde se ha decidido que en procedimientos que han tenido carácter sensacionalista como el de autos y en el que pueden ocurrir incidentes lesivos a la dignidad y orden de un tribunal, se ameritan medidas de seguridad como las tomadas por el juez sentenciador sin que esto violente el derecho de un acusado a juicio público.

■ Es además principio hace ya tiempo establecido que las cortes tienen poderes inherentes para excluir a espectadores y tomar las debidas precauciones durante un juicio para prevenir incidentes que puedan interferir con el decoro que ha de prevalecer en toda corte. *People* v. *Cash,* 345 P.2d 462 (Cal. 1959) ; *Cody* v. *State,* 361 P.2d 307 (Okl. 1961) ; *Geise* v. *United States,* 265 F.2d 659 (9th cir. 1959) ; *People* v. *Blanco,* 339 P.2d 906 (Cal. 1959) ; 5 Wharton, Criminal Law and Procedure, Sec. 2029 (12th ed 1957) ; Radin: *The Right to a Public Trial,* 6 Temp. L. Q. 381 (1932) ; Goheen, *Right to a Public Trial,* 35 Mich. L. Rev. 474 (1937) ; Anotación 48 A.L.R.2d 1436.

*Pueblo* v. *Collazo,* 19 D.P.R. 961 (1913) es claramente inaplicable. Allí se excluyó en un caso de alterar la paz, a todo el público mientras declaraba una testigo, a pesar de las protestas del acusado.

· 2. Sostiene el apelante que el tribunal de instancia debió dar instrucciones al jurado que eliminaran del ánimo de éste el efecto que pudo haber producido la información, que con antelación al caso, publicó la prensa del país sobre los hechos que luego se ventilaron.

■ Pero es que no consta en autos que el apelante hubiese solicitado tales instrucciones. Por el contrario, al terminar la corte sus instrucciones al jurado, ésta específicamente anunció al ministerio fiscal y a la defensa que estaba en disposición de recibir cualquier instrucción que quisiera proponer la defensa o el fiscal, contestando ambos en la negativa. Más adelante, adjunto al expediente, aparece un pliego de instruc-

ciones especiales sometido por la defensa en el que no aparecen las instrucciones señaladas aquí por el apelante. No puede pues el acusado alegar que la corte cometió error al no dar instrucciones al jurado sobre tales puntos. *Pueblo* v. *Robles*, 10 D.P.R. 496 (1906) y *Pueblo* v. *García*, 78 D.P.R. 396 (1955).

Cierto es, que las personas que actuaron como jurados en el de autos declararon haberse enterado por la prensa de distintos pormenores del caso. No obstante aclararon que se sentían capacitados para rendir un veredicto imparcial que se ajustara a la prueba que ante ellos iba a desfilar sin que mediaran prejuicios o disposiciones de ánimo que pudiesen ser perjudiciales al acusado, quedando así capacitados para juzgar al apelante con imparcialidad. Siendo ésta la situación, ¿qué necesidad había de unas instrucciones en el sentido que apunta el apelante? 34 L.P.R.A. § 681 (7); *Porter* v. *State*, 361 P.2d 695 (Okl. 1961); *Moore* v. *State*, 250 P.2d 46 (Okl. 1952); *Murphy* v. *State*, 112 P.2d 438 (Okl. 1941); Cf. *Pueblo* v. *Dumas*, 82 D.P.R. 416 (1961). Además el acusado no se opuso a que dichas personas formaran parte del jurado habiéndose excusado aquellos jurados a quienes presentó objeción la defensa.

3. Afirma además, que el fiscal hizo declaraciones y afirmaciones en su turno de exposición que contribuyeron a prejuiciar al jurado en contra del apelante. A continuación las relatamos:

(a) El fiscal describió al acusado y a su hermano como dos pendencieros que al llegar al sitio de los hechos promovieron allí un desorden;

(b) El fiscal admitió que el acusado estaba hablando en voz alta y que el policía que se había personado para investigar lo que en aquel sitio estaba ocurriendo, se dirigió a él para llamarle la atención, lo que no está sostenido por la prueba;

(c) El fiscal se manifestó a los efectos de que el acusado y su hermano hicieron varios disparos después de haber forzado la caja registradora y se llevaron el dinero regando algunas monedas por el piso. Esto, sostiene el apelante, impresionó al jurado al presentarlo de antemano como un forajido armado.

Analicemos estas manifestaciones en el mismo orden en que quedan expuestas:

(a) La palabra "desorden" se queda corta para describir lo que ocurrió en el sitio de los hechos donde murieron dos policías uno de ellos con heridas de puñal y de bala; se hizo huir a las personas que allí se encontraban; se hirió al administrador del negocio y se le disparó a un automóvil que transitaba por aquel lugar. Obviamente el apelante está sacando fuera de contexto las manifestaciones del fiscal al referirse al desorden que allí se provocó. Es lógico presumir que el fiscal se refería a la situación general creada allí por el acusado y su hermano y no debe entender el apelante que el fiscal se refería a un desorden promovido en el momento en que el acusado y su hermano llegaban al lugar y sí la situación general que más luego se produjo en el sitio de los hechos.

(b) La afirmación objetada por el acusado es mera conclusión lógica que hace el fiscal de los sucesos ocurridos a base de toda la prueba, y que fue confirmada por el testigo presencial Gonzalo León al declarar que el acusado con voz alterada se puso a decir "aquí no ha pasado nada y ella no sabe nada" mientras el policía interrogaba a la cocinera.

(c) Debe entenderse que en su exposición preliminar el fiscal tomó en consideración no sólo la acusación de asesinato en primer grado sino también las demás acusaciones presentadas en su contra, una de las cuales era por el delito de robo, acusación que posteriormente fue renunciada por el ministerio fiscal.

El mismo acusado admite que es norma general permitir, tanto a la defensa como al fiscal, una razonable latitud en la exposición al jurado de aquello que intenta probar. *Pueblo* v. *Díaz*, 74 D.P.R. 375; 5 Wharton's Criminal Law & Procedure, Sec. 2173 (12th ed. 1957); Anotación 28 A.L.R.2d 972, 974.

Es claro que también puede el fiscal hacer alusiones a cualquier hecho que fuera inseparable de las circunstancias que rodean el delito y que ayudan a una más clara comprensión por el jurado de la teoría del ministerio fiscal. *Pueblo* v. *Díaz*, supra, donde nos expresamos así a la pág. 382:

"Aún si el ministerio público en la exposición de su teoría se refiere a hechos que no son probados posteriormente por no haber sido admitida la prueba, si la cuestión de admisibilidad es debatible y si el fiscal ha actuado de buena fe y con fundamentos razonables para creer que la prueba sería admisible, no constituye error alguno el que el fiscal se refiriese a esos hechos."

No creemos que hubiesen sido impropias las manifestaciones del fiscal pero suponiendo que lo hubiesen sido, no hay base para inferir que éstas hubiesen afectado al jurado de tal manera que se hubiesen perjudicado los derechos del acusado y se hiciese necesaria la revocación de la sentencia. *Pueblo* v. *Díaz*, supra.

Por último tampoco hizo el acusado en el caso de autos ni siquiera una objeción general a la exposición del fiscal. Esto de por sí constituye suficiente renuncia a sus derechos salvo en casos excepcionales. *Pueblo* v. *Fournier*, 80 D.P.R. 390, 405 (1958); Anotación 28 A.L.R.2d 927, 984, 985.

4. Alega el acusado que se le permitió al ministerio fiscal formularle a testigos de cargo preguntas perjudiciales que sugerían contestaciones sobre supuestas admisiones autoincriminatorias del apelante. Las manifestaciones a que se refiere el acusado fueron parte de la deposición del teniente José A. Nazario, testigo de cargo, quien en el examen directo declaró a preguntas del fiscal que el acusado estando en la

fiscalía le había ofrecido a él (el testigo) y al fiscal entregarles el revólver del policía Crespo. Sostiene el apelante que dichas manifestaciones carecieron de voluntariedad o pudieron haber sido motivadas por presiones sicológicas que respondían a las circunstancias en que se encontraba.

Pero el apelante no ha probado ni hemos podido encontrar en el récord evidencia que sostenga esta creencia personalísima del acusado. No hay indicios que permitan a este Tribunal tan siquiera inferir que mediaron tales presiones sicológicas o que las manifestaciones del acusado carecieran de voluntariedad.

5. Añade el acusado que un examen de la declaración del testigo de cargo revela lo que él llama una situación incomprensible. Arguye que dicho testigo primero declaró que el apelante estaba en la oficina del fiscal cuando prometió ir a su casa con la policía a buscar el revólver del guardia Crespo. Luego alega que en el contrainterrogatorio declaró que dicho apelante estaba escondido en su casa, a la sazón rodeada de policías, cuando el testigo llegó e hizo entrada con la hermana del acusado a la casa de éste. Concluye el apelante que si el acusado se encontraba en la fiscalía donde se dice prometió entregar el revólver, obviamente no podía estar en su casa cuando la policía fue a buscar dicho revólver supuestamente acompañado del apelante.

Un examen del récord resuelve de inmediato la supuesta contradicción. Obviamente las manifestaciones del teniente Nazario se refieren a dos sucesos diferentes. En el contrainterrogatorio y a preguntas de la defensa el teniente Nazario declaró que había ido a la casa del acusado durante las horas de la noche; que la casa se encontraba rodeada de policías y que afuera de ésta se encontraba una hermana del acusado a quien el teniente le pidió permiso para entrar a la casa; que ella lo llevó hacia el cuarto donde se encontraba el acusado y de la cocina salió éste tirándole un puño al testigo. Luego forcejaron ambos y en eso se oyó un disparo fuera de la casa.

De allí sacaron al acusado llevándole primero al cuartel de San Juan por razones de seguridad para él y luego a la fiscalía de Bayamón. El incidente narrado constituye el arresto del apelante.

En el interrogatorio directo el testigo Nazario le declaró al fiscal que en la mañana del 14 de junio temprano recibió una encomienda de parte del fiscal que consistió en que acompañado del acusado fuese a la casa de éste a ocupar el revólver del policía Crespo. La encomienda se debió a las manifestaciones a que ya hemos hecho referencia en que el acusado ofrecía entregar el revólver del guardia Crespo.

La supuesta contradicción se reduce a nada pues como se desprende de la declaración que hemos citado, el incidente en que se ocupó el revólver del policía Crespo fue con posterioridad a su arresto, encontrándose ya el acusado en manos de las autoridades. O sea, después de haberse consumado el arresto del acusado por el teniente Nazario durante la noche, y haber sido llevado a la fiscalía de Bayamón, siendo allí que el apelante hizo las manifestaciones que luego dieron lugar al encargo hecho por el fiscal al teniente Nazario.

6. También impugna el apelante la entrada que hicieron las autoridades a su casa pero entendemos que el permiso dado por la hermana del acusado al teniente Nazario para que entrase, estando acompañado de la propia hermana del apelante, quien lo condujo hasta donde se encontraba éste, constituye suficiente renuncia al derecho que ahora reclama.

7. Sostiene el apelante que cometió error el juez de instancia al admitir en evidencia las ropas de las víctimas ya que ese hecho tendió a intensificar la animosidad del jurado contra el apelante, privándolo así de un juicio imparcial. Pero es que ya en *Pueblo* v. *Quintana*, 50 D.P.R. 63 (1936) consideramos esta cuestión y adoptamos para esta jurisdicción la regla que admite la presentación en evidencia de las ropas de las víctimas, mediando ciertas circunstancias que concurrieron en el caso de autos. Y se ha sostenido que son

admisibles no importa el hecho de que le pueda perjudicar al acusado. Anotación 68 A.L.R.2d 903, 906. Claramente procedía la admisión de esta evidencia para demostrar la naturaleza de las heridas, la posición de las víctimas con relación al acusado y la forma y manera en que se ocasionaron las heridas que causaron la muerte. *Mills* v. *People*, 362 P.2d 152 (Colo. 1961); *Longoria* v. *State*, 168 A.2d 695 (Del. 1961); *State* v. *Nelson*, 321 P.2d 202 (N.M. 1958), cert. den. 361 U.S. 877; *Slater* v. *State*, 336 S.W.2d 163 (Tex. 1960).

8. Con motivo de la presentación en evidencia de las ropas, se alega que la viuda de una de éstas hizo una manifestación de duelo que obviamente tuvo que impresionar adversamente al jurado. Nada hay en el récord ante nos sobre este supuesto incidente y el tribunal de instancia correctamente rechazó la pretensión del apelante al efecto de presentar, el día señalado para la aprobación de la transcripción de evidencia, un suelto de un periódico de circulación general donde se hacía alusión a este incidente. Ahora bien, independientemente del hecho de que no haya nada en el récord sobre este incidente, la norma en estas situaciones, es que el acusado debe demostrar con prueba fehaciente que el incidente ha sido en verdad perjudicial. Anotación 46 A.L.R.2d 949. En ningún momento del juicio el abogado del acusado protestó del incidente ni solicitó instrucciones especiales para que el jurado no tuviera en cuenta el incidente. Véase *Duff* v. *State*, 111 So.2d 621 (Ala. 1958); *State* v. *Peters*, 352 P.2d 329 (Hawaii 1959).

9. El apelante objeta la admisión en evidencia de ciertas fotografías tomadas en el sitio de los hechos y que demostraban a las víctimas, tendidas en el suelo tal como quedaron la noche de los hechos. El Estado las ofreció para probar la posición en que quedaron los cadáveres de las víctimas y corroborar la declaración del patólogo. El acusado alega que la presentación de esta serie de fotografías le perjudicaron, pues tenían que producir reacción de dolor, de lástima, de com-

pasión para con las víctimas y sus deudos. No creemos que a los jurados deban mantenérsele aislados de los hechos que precisamente van a juzgar. No podemos presumir que sean personas de sensibilidad extrema, que el menor contacto con cualquier incidente, en casos de asesinato o de cualquier otro delito que estén juzgando, le afecte su ánimo en tal forma que le impida rendir un veredicto imparcial. Ellos deben conocer todo lo relacionado con el caso que juzgan para estar en mejores condiciones de rendir un veredicto. Se ha sostenido que fotografías como las que objeta el apelante son admisibles. *Pueblo* v. *Fournier,* supra; *Pueblo* v. *Torres,* 75 D.P.R. 231 (1953); *State* v. *Robinson,* 360 P.2d 474 (Ariz. 1961); *Stewart* v. *State,* 345 S.W.2d 472 (Ark. 1961); *People* v. *Kemp,* 359 P.2d 913 (Cal. 1961); *People* v. *Robillard,* 358 P.2d (Cal. 1961); *Mills* v. *People,* supra; *Stoken* v. *State,* 128 So. 2d 341 (Miss. 1961); *State* v. *Bennett,* 168 A.2d 282 (R.I. 1961).

██ 10. El apelante levanta la cuestión de la impertinencia e irrelevancia del testimonio de un testigo, en relación con el incidente ocurrido después de los hechos por los cuales se juzga al acusado. Se refiere a los disparos que se alega hizo el acusado a un carro que trató de detenerse cuando vio los cadáveres tendidos en la carretera. Este testimonio aunque pueda considerarse irrelevante en cuanto a los hechos principales, da luz en cuanto a la actitud de los acusados aún después de ocurridos los hechos. Completaba el cuadro de todo lo que allí pasó. Pero aún si fuera irrelevante e impertinente, toda la otra prueba desfilada es más que suficiente para sostener el veredicto del jurado.

██ 11. El acusado solicitó una inspección ocular del lugar donde sucedieron los hechos con el propósito de "determinar el sitio donde se encontraba escondido detrás de unas matas" un testigo presencial, el administrador del negocio y que fue la primera persona agredida la noche de los sucesos. Y a esos efectos se concedió. Alega que la inspección se llevó a

cabo en circunstancias perjudiciales al acusado ya que entre otras cosas el testigo antes aludido declaró que la noche de los hechos estaba bien oscura, mientras que la inspección se llevó a cabo a pleno sol. Obviamente no es en apelación el momento para protestar. Si el acusado entendía que la inspección debía ser de noche, debió haberlo expresado así a la corte. Sin embargo lo que surge del récord es, que a preguntas del juez de instancia al efecto de si las partes estaban conformes con la inspección que se había llevado a cabo del lugar, la defensa contesta que lo estaba.

12. Alega el apelante que la corte a quo no dio instrucciones sobre defensa propia en relación con el hermano del acusado, en el incidente inicial que tuvo con el encargado del negocio. El apelante no solicitó instrucciones a ese efecto, pero la realidad es que de la prueba fiscal, única que desfiló ante el jurado, no surge elemento alguno que justifique una instrucción de defensa propia. Lo que aparece del récord es que el administrador del negocio le pidió al hermano del acusado que se saliera de la barra, donde obviamente no tenía derecho a estar, y de ahí surgió un encuentro al ser agredido por éste, y es entonces que el acusado lo agrede con un puñal estando el administrador del negocio desarmado. Cuando las otras personas que estaban allí intervinieron huye para evitar otra agresión.

13. Objeta el apelante las instrucciones que dio la corte a quo referentes al delito de portar armas prohibidas y alega que la portación que se le imputa al acusado fue incidental y que nuestras decisiones sostienen que tal portación no constituye delito. Sin detenernos a considerar la portación del arma en el sitio de los hechos, se demostró que el acusado llevó el arma homicida que le quitó al policía Crespo hasta su casa. Claramente esto es suficiente portación para quedar incurso en la violación de la ley.

14. La alegación del apelante al efecto de que le fue perjudicial el que el juez que presidió la vista no hiciera un re-

sumen de la prueba se contesta con la afirmación que aparece en el récord, pòr parte de la defensa, de que está conforme con que no se haga tal resumen. Pero véase *Pueblo* v. *Millán*, 71 D.P.R. 440 (1950). Alega el apelante que la circunstancia de no resumir la prueba le perjudicó, ya que le privó de que se dieran instrucciones sobre arrebato de cólera o súbita pendencia. El hecho de que no se hiciera un resumen de la prueba no pudo tener el efecto de privar al apelante de que se dieran instrucciones sobre defensa propia, si hubiera habido base en la prueba para justificar instrucciones en ese sentido. Ahora, la instrucción no fue solicitada, pero la realidad es que nada hay en la prueba que justifique una instrucción en ese sentido, como tampoco hay nada que hubiera justificado transmitir las otras instrucciones solicitadas por el acusado. La prueba demuestra suficientemente la existencia de malicia premeditada y deliberación.

15. El apelante pretende que se le anule el veredicto por el fundamento de que el jurado actuó movido por pasión, prejuicio y parcialidad y para sostener su pretensión afirma que el jurado trajo un veredicto de culpabilidad a pesar de que hubo contradicciones en la prueba de cargo. Es por demás frívolo el error señalado. Las contradicciones en que incurrieron los testigos de cargo son las usuales en que se incurren, cuando más de una persona presencian unos hechos y luego los relatan. Ahora, en los hechos fundamentales no hay contradicciones. Y mal puede tildarse de parcial y prejuiciado a un jurado que rinde un veredicto de culpabilidad en un caso porque haya habido contradicciones en la prueba. En el presente caso el acusado durante el juicio celebrado en el tribunal de instancia gozó de todas las garantías que la Constitución y las leyes de Puerto Rico establecen y ciertamente no es este el caso para aplicar la cita que hace el apelante de *Batalla* v. *Tribunal de Distrito*, 74 D.P.R. 289 (1953).

*Se confirma la sentencia apelada.*